

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | \* | CR 07-30025 |
| | \* | **2007 D.S.D. 28** |
| Plaintiff, | \* | |
| -vs- | \* | ORDER AND OPINION |
| CALEB GILKERSON, | \* | |
| Defendant. | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**KORNMANN, U.S. DISTRICT JUDGE**

[¶1]  The defendant has perfected an appeal from his conviction and his sentence by a United States Magistrate Judge. The District Court has jurisdiction pursuant to Fed.R.Crim.P. 58(g)(2)(B). Pursuant to Rule 58(g)(2)(D)of such rule, the defendant is not entitled to a trial *de novo*; the scope of the appeal is the same as in an appeal to the court of appeals from a district court. The standard of review for sufficiency of the evidence requires this court to affirm the verdict of the magistrate if "there is substantial evidence, taking the view most favorable to the Government, to support it." U.S. v. Lofton, 233 F.3d 313, 317 (4th Cir. 2000). Legal questions presented are reviewed *de novo* while findings of fact are reviewed for clear error. In the present case, we have only a general verdict, much as a jury would render. No findings of fact or conclusions of law were entered, the parties having waived any right to have the same entered.

[¶2]  Scienter or intent is not an element in a prosecution under 16 U.S.C. §703. Given this fact, it is sometimes rather difficult for hunters and processors to comply fully with all the regulations. I will discuss this further in this opinion. This does not alter the fact that the government must prove any violation of a criminal statute and prove it beyond a reasonable doubt.

[¶3]  I have read the rather lengthy transcript of the trial, the exhibits, the transcript of the sentencing hearing, and all the documents filed.

[¶4]     This case and the underlying facts may be summed up as "mass confusion" and "much ado about very little." As the magistrate judge expressed at the sentence hearing, it appears that the case arose out of a personality conflict between the defendant and the federal game official. I agree with that characterization.

[¶5]     I take judicial notice of a number of items. Petitions have been signed by hundreds of people in the Pierre, South Dakota, area, demanding the removal of the federal game official in question. Public meetings have been held to protest what citizens (mostly hunters, of course) claim has been a long history of poor treatment of hunters by the game official. A large number of charges have been leveled against the official in question as to claimed harassment of hunters and others, of the frequent use of profanity in dealing with the public, of arrogance, of threatening landowners and others, and of a general lack of common sense and respect in dealing with the public. The controversy rose to such a pitch that Governor Rounds made written and oral complaints to the Fish and Wildlife Service ("FWS"). The Governor and his then chief of staff more than once publicly demanded the removal of the federal official from his duties in South Dakota. FWS declined to do that. The Governor then publicly instructed employees of the South Dakota Game, Fish, and Parks Department ("SDGFPD") to not cooperate with any agent of FWS unless and until the agent was removed. A formal cooperation agreement between South Dakota and the FWS was terminated, i.e. not renewed. After this occurred, FWS announced that the agent in question would no longer act "in the field" but would act in a supervisory capacity only. Normal cooperation then resumed between federal and state wildlife officers.

[¶6]     In my past life, I was a police officer for three years while attending law school. Perhaps the most difficult part of being a law enforcement official is to be "nice to people." Any person with power over others must be very careful and cautious in wielding that power and authority. It is very easy to abuse one's authority, especially when it comes to issuing tickets or arresting someone. Without passing judgment of any kind, it is well known that the agent in question is perceived by hundreds of people as not being "nice to people". Having said all of this, a game and fish law enforcement official has a very difficult job. The officer is required to deal with landowners who erroneously think the wild animals belong to them (and, of course, the

landowners feed those animals and suffer losses of feed and crops), to deal with slob hunters (and there are too many of them), to deal with trespassers, with poachers, and with wealthy or powerful people who simply think they are above the law.

[¶7]   These officials, especially federal officials, are required to deal with sometimes poorly conceived and poorly written regulations and laws. Some of the regulations and laws fly in the face of all common sense. For example, a reading of 16 U.S.C. §703 (the statute in question) tells us that, unless and except as permitted by regulations, it is unlawful, without repeating the extensive verbiage, to pursue, hunt, take, or "attempt to take" a migratory bird. In other words, if a hunter attempts to take geese, the hunter is finished after three errant shots. This makes no sense. I know of no regulation that exempts "attempts to take" from the required "count." Yet no rational game official would count the errant shots and issue a ticket on the fourth shot, disregarding the fact that nothing had been bagged. A ticket apparently could be issued if the goose is wounded and leaves the area or even flies into an area where the bird cannot be retrieved. It would make little common sense to issue a ticket where the hunter is obviously acting in good faith and is not attempting to waste birds or otherwise violate the law. By analogy, a highway patrol trooper could issue a ticket to every vehicle traveling one mile over the posted limit. They do not do so based upon common sense enforcement of the law.

[¶8]   I do not judge, of course, who is right and who is wrong with regard to the public controversy.

[¶9]   The Information (Doc. 1) charged defendant with having had 60 geese that were not tagged as required by 50 CFR 20.36. The government discovered it was in error and the Amended Information (Doc. 7) alleged 28 birds, a 53% reduction from the original charge.

[¶10]   Much of the controversy in this case stems from geese shot at a commercial hunting operation near Pierre, SD, known as Cheyenne Ridge ("CR"). CR had no so-called "picking slips" which were used at processors' places of business. Processors such as Steamboat Game and Fish, Inc., ("Steamboat"), where the defendant was employed, clean, package, freeze, sometimes smoke, and sometimes ship geese and other birds to nonresident hunters' homes. Steamboat uses "picking slips." CR and other hunting operations did not have "tags" on hand. There is no particular form, size, or method of attachment as to tags which are to be sometimes

3

placed on harvested geese. In other words, no tag is furnished by federal or state officials such as is done by state officials with deer, antelope, and turkey.

[¶11] 50 CFR contains the applicable regulations and §20.36 provides: "No person shall put or leave any migratory game birds at any place (other than at his personal abode), or in the custody of another person for picking, cleaning, processing, shipping, transportation, or storage (including temporary storage), or for the purpose of having taxidermy services performed, unless such birds have a tag attached, signed by the hunter, stating his address, the total number and species of birds, and the date such birds were killed. Migratory game birds being transported in any vehicle as the personal baggage of the possessor shall not be considered as being in storage or temporary storage."

[¶12] SDGFPD issued state forms, namely permits to transport migratory waterfowl for processing. See, e.g., exhibit 7. On this form, a hunter places his name, address, hunting license number, his signature, the description of the waterfowl species and the number of birds. Steamboat would receive these forms and generate its own computer tags, each with a job number. The computer tag showed the name of the private ranch or commercial hunting operation, such as CR, from where the birds had come. It showed the number of birds and the species as well as the date the birds were brought to Steamboat. It showed the telephone number of CR plus the name and address of Steamboat. The SDGFPD form also called for the date of bird delivery to be shown together with the name of the individual (printed and signed) who received "processed birds." This would seem to be the hunter and not anyone from Steamboat but the practice was to have someone from Steamboat sign and date the form.

[¶13] Steamboat and CR considered this SDGFPD form to be the equivalent of the tag required by §20.36. This is despite the fact that the SDGFPD form did not state the date the bird or birds were killed. This is also despite the fact that the SDGFPD form was designed to cover a number of birds, e.g. nine birds on one form. The form was not attached to any particular goose. The form was "invented" to avoid hunters having to accompany someone from the commercial hunting operation, such as CR, to the processor. I do not understand this rationale since §20.37 provides: "No person shall receive or have in custody any migratory game birds belonging to another person unless such birds are tagged as required by §20.36." Thus, if the tags are placed

4

on the birds in the field, one would think there would be no problem with someone from CR transporting the birds to Steamboat. However, I suppose it could be said that the transporting employee would be in violation of §20.33 which provides: "No person shall possess more migratory game birds taken in the United States than the possession limit or the aggregate possession limit, whichever applies." In other words, the transporting employee with birds in his custody could not transport more than three birds on the opening day of the season or six birds thereafter. SDGFPD could not authorize a violation of a federal regulation but it would appear that SDGFPD was attempting to simplify matters. To further compound the matter, §20.39 provides: "Subject to all other requirements of this part, the possession of birds taken by any hunter shall be deemed to have ceased when such birds have been delivered by him to another person as a gift; (sic) or have been delivered by him to a post office, a common carrier, or a migratory bird preservation facility (such as Steamboat) and consigned for transport by the Postal Service or a common carrier to some person other than the hunter." I do not know whether the transportation service provided by CR for the birds would make CR a common carrier. Common sense would tell us that it makes no sense for all hunters to be required to accompany tagged birds to the processor. Common sense, however, too often has little to do with how the federal government does business.

[¶14]  The SDGFPD form states at the bottom of the form that there must be compliance with "Federal Regulation 50 CFR 20.36," then stating: "Waterfowl must be individually tagged - listing the hunter name, signature, address, total number/species of waterfowl, and date of kill."

[¶15]  Having discussed all of this, I will move to the heart of this case. The Amended Information charged defendant, an individual, with receiving and having in custody "at a migratory bird preservation facility" untagged geese. Specific reference was made to not only the statute but to 50 CFR 20.81. This regulation states: "No migratory bird preservation facility shall receive or have in custody any migratory game birds unless such birds are tagged as required by §20.36." The Amended Information did not claim or charge that the defendant himself was a "migratory bird preservation facility." This probably stems from the fact that no human being can be a "facility." Random House Unabridged Dictionary, Second Edition, defines "facility" as:

"something designed, built, installed, etc. to serve a specific function, affording a convenience or service . . ." A human being is not "something." A human being is "someone."

[¶16] Although the Amended Information references 50 CFR 20.36 and 50 CFR 20.81, there was no reference to 50 CFR. §20.11(e). Nevertheless, 50 CFR §20.11(e) tells us that a "Migratory bird preservation facility" means "(1) Any person who, at their residence or place of business and for hire or other consideration; or (2) Any taxidermist, cold-storage facility or locker plant which, for hire or other consideration; or (3) Any hunting club which, in the normal course of operations; receives, possesses, or has in custody any migratory game birds belonging to another person for purposes of picking, cleaning, freezing, processing, storage or shipment."

[¶17] I suppose it could be argued that the defendant personally is covered by subsection (1) as a person working at a place of business. The problem with this proposition is that the defendant is not a sole proprietor. He is a salaried employee of a corporation. Stockholders do not "own" a corporation, even if there is only one stockholder. Each stockholder owns his or her stock with the right to vote the stock in the election of officers and directors. He is also not the sole stockholder. The place of business was not his. It was that of the corporation.

[¶18] Caleb Gilkerson is not and was not a "migratory bird preservation facility." Lopez v. Gonzales, 549 U.S. \_\_\_\_\_, \_\_\_\_\_. (2006) (slip op. at 7), rejected the government's interpretation of a statute, stating ". . . we do normally speak or write the Government's way." Courts do not allow the government to trump the ordinary meaning and the conventions of the English language. As already stated, he was and is an employee of a South Dakota corporation. No evidence was actually offered or received as to what entity was the "facility" in question. Some discussion is found at page 20 of the transcript of the sentencing hearing where the defendant states, in answers to questions posed by the judge, that there is "one corporation" and that there are other shareholders with interests in the corporation. The presentence report tells us that the correct name of the facility is a corporation, namely Steamboat Game and Fish, Inc. It reports that the defendant was a salaried employee of the corporation. These are important distinctions. Piercing the corporate veil does not apply to a criminal prosecution and there is no allegation that it does in this case.

6

[¶19] The regulations in question do not state that no officer, director, agent or employee of such facility shall permit the facility to have in custody birds not property tagged. Nothing is stated to provide that no such person shall assist the facility in having in custody birds not properly tagged. It would be a simple matter to have so provided.

[¶20] There was no evidence that the defendant in his personal capacity received untagged geese. There was no evidence that the defendant in his personal capacity had in his custody any such birds. He obviously could not have had personal custody of such birds since the business enterprise was a corporation and the custody would be that of the facility and the corporation. The defendant personally did not receive any birds "for hire or other consideration." All compensation paid by the hunters would be due the corporation and not the defendant personally.

[¶21] The verdict itself found the defendant guilty of violating the statute and 50 CFR 20.81. As a matter of law, the defendant, under the undisputed facts of this case, could not have been found guilty beyond a reasonable doubt of a violation of the regulations or statute in question. This is despite the fact that no specific challenge was launched by the defendant as to the propriety or legality of the amended information. In other words, no party raised the question of whether the defendant as an individual could be charged under the regulations and statue in question and the magistrate court did not address the question.

[¶22] An error "not argued to the district court is grounds for reversal only if the error prejudices the substantial rights of the defendant and would result in a miscarriage of justice if left uncorrected." United States v. Fountain, 83 F.3d 946, 949 (8th Cir. 1996). "Plain error is extremely narrow and is limited to those errors which are so obvious or otherwise flawed as to seriously undermine the fairness, integrity, or public reputation of judicial proceedings." United States v. Beck, 250 F.3d 1163, 1166 (8th Cir. 2001). The defendant did preserve his rights by motions for judgment as a matter of law, despite the failure of any party to specifically address the many important differences between someone who works for a corporation and the corporation itself. Failure to address the differences constituted a clear error of law. I find that this is a case where the plain error doctrine should be applied. The motion for a judgment as a matter of law should have been granted and the action dismissed.

[¶23]   The case of United States v. Plaza Health Laboratories, Inc., 3 F.3d 643 (2nd Cir. 1993), dealt with the meaning of "point source" in the Clean Water Act.  The question was whether a human being could be a "point source."

> In criminal prosecutions the rule of lenity requires that ambiguities in the statute be resolved in the defendant's favor. *Crandon v. United States*, 494 U.S. 152, 168 . . . (1990) (ambiguity in criminal statute resolved in defendant's favor "unless and until Congress plainly states that we have misconstrued its intent"); *Bifulco v. United States*, 447 U.S. 381, 387 . . . (1980) (same); *Huddleston v. United States*, 415 U.S. 814, 830-31 . . . (1974) (ambiguity concerning ambit of criminal statutes should be resolved in favor of lenity).  In other words, we cannot add to the statute what Congress did not provide.  "[B]efore a man can be punished as a criminal under the Federal law his case must be 'plainly and unmistakably' within the provisions of some statute." *United States v. Gradwell*, 243 U.S. 476, 485 . . . (1917).

*Id.* at 649.

[¶24]   As in the Plaza Health case, the criminal provisions in question did not "clearly proscribe" the defendant's conduct and "did not accord him fair warning of the sanctions the law placed on that conduct."  All of this teaching certainly applies to federal regulations adopted by an agency.

[¶25]   This action should be dismissed with prejudice.  The fine and costs paid by the defendant should be forthwith refunded to him.

[¶26]   Now, therefore,

[¶27]   IT IS ORDERED, as follows:

   1) The verdict (Doc. 25) of the magistrate is set aside and this action is dismissed with prejudice.

   2) The fine and costs paid by the defendant shall be forthwith refunded to him.

[¶28]   Dated this 17th day of December, 2007.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: _____
                    DEPUTY
       (SEAL)

8